Thank you, Your Honors. May it please the Court, Intamin and Magnetar are back here a second time, asking the Court's assistance in the claim construction and applying that claim construction to an invention that relates to magnetic brakes for amusement park rides. Previously we were here on two different, one similar claim limitation, as before the Court, one different one. This Court remanded for further determination to the District Court and now we're back after a second summary judgment motion by Magnetar relating to two specific claim limitations. One, whether the conductive rail is adapted to extend the length of the fixed device part, and two, whether the conductive rail is configured for attachment to the fixed device part. Well, it's clearly not extending the length of the fixed device part, is it? It's at the end. Well, Your Honor, there's evidence that supports that the braking system of Magnetar actually could extend the length, literally, of the fixed device part because Mr. Prybonik, the President and owner of the company, offered to sell to two companies brakes for a drop tower ride, and that type of ride requires that the conductive rail extend from the top to the bottom, while there's not a braking code. Yes, but that's because there's a purpose for that. You have to have that much momentum to build up the charge to make the brakes work, and so they'll work in the last third when you've built up a proper amount of charge, which, of course, is not necessarily in the roller coaster embodiment because it's into the flat part, and they can stop it in shorter time. You're not going to put the whole length of the roller coaster, are you? Well, moving first to the extended length on the drop tower ride, it actually doesn't, the conductive part does not extend for the patent the entire length of the drop tower ride. Instead, in order to get that rush that patrons want, you have to have a free fall at the very beginning. And it's not that the brakes need to charge up any kind of eddy current in order to create a braking force, it's that the coding that creates that, the conductive coding is not present until a certain distance down the rail so that the patrons can have free fall for a certain distance, then the braking force starts. So the, it does, the conductive rail does extend the length, but the braking force only happens for a portion of the ride, similar to a roller coaster implementation because you don't want braking to occur throughout the ride on a roller coaster. You want speed to be built up, slowed down in certain parts. What they actually call the magnetic brakes in that instance is a trim brake. But how do we possibly find the claim element adapted to extend the length of the fixed device part? How do we apply that to Magnetar's product? Okay. There are two ways, Your Honor. First, under the literal infringement, because Mr. Prybonik offered to sell brakes for a drop tower ride, which would require his magnetic brake system to have a conductive rail that extends the entire length of the ride. We intimately submitted evidence to the district court that there's memorandums between Mr. Prybonik and his client that if we do it, we can put the rail on the track or we can put the rail on the car. It's up to us. Clients don't really care. Also, additional evidence that Mr. Prybonik admitted on two occasions to offering to sell drop tower rides, brakes for drop tower rides, actual offers to sell. And when he was asked, does that mean that the conductive part, the rail, is attached to the track, he said yes. So under literal infringement, there is evidence that Magnetar's braking system, because of these offers for sale, it could in fact extend the entire length of the track. And under the doctrine of equivalence, it's basically, as you pointed out, Your Honor, the purpose of that conductive fin is to pass through the magnets and create an eddy current in order to have a braking force. It's the same thing in whether it's attached to the track or whether the fin is attached to the car. Is it the case that if someone holds themselves out as possibly able to infringe a patent, that that's an infringement of the patent? It's under, it would be, if they offered to make a sale, it would be evidence that that is actual infringement. And that's what Mr. Prybonik did. He made two offers to sell brakes for a drop tower ride. But your assumption is in order to do that, he would have had to use your invention rather than his own. In order to do that, his conductive rail would have had to extend the length of the track. How do we know that? We know that from his evidence, his deposition in which he states that in that situation, you would attach the conductive rail to the track. And the fact that in Mr. Kernack's declaration on behalf of Intamin, describing drop tower rides, that's how it's done in the industry. What did the trial judge say? These were the two Asia offers in Asia. Yes. What was the trial judge's handling of that issue? The trial judge did not regard that evidence as enough to create a tribal issue under literal infringement. And we contend that the trial judge erred by doing that, given that these, because, and the trial judge did so when it adopted the interpretation from Judge Taylor, the original 2005 district court judge, in light of the interpretation provided by this court under that same exact extend the length limitation, and said that it would look at the evidence. It was presented with the same evidence that we presented to Judge Taylor, who said that there's genuine issues of material back there. So that wasn't presented the first time. The second trial judge didn't think so. Second trial judge didn't think so, and the primary reason was that Mr. Pribonik submitted an additional declaration in support of his 2009 motion for summary judgment, saying we don't do it that way. But there's evidence that you can't erase what he already said in deposition, which was he made that offer, and that the brakes would extend the length of the, or brakes would be on the track, or the conductive rail would be on the track, and the magnets on the car in that situation. He also said in his declaration in support of his 2009 motion that he included a price for that particular arrangement, and previously he stated that there was a written offer, and this is also in his deposition, in both of those instances, but he didn't produce those written offers in response to discovery, and so we are forced to conclude or draw inferences from what that written offer, that those bids included, and the reasonable inference to be drawn there in light of the evidence is that these were offers to sale. That's right. But, Mr. Ward, does that mean that the offer of sales were exactly the same as what the patent claims would cover? There's questionable evidence on that basis, isn't there? Your Honor, the... seemed to believe that there was insufficient evidence to go forward on that basis. The evidence that was presented was that a drop tower ride requires that the conductive rail run the length of the ride for the exact same reasons that were pointed out earlier, that there's a lot of momentum, and the car is heavy, and it's dropping straight down, so the braking force had to be applied consistently throughout the long distance, as opposed to a trim brake, which is located on a track here and there throughout a roller coaster ride. So there was sufficient evidence to show, and there was no contrary evidence to show, that Mr. Prybonik devised some other way to do a drop tower ride. He described in deposition that it would be a conductive rail fixed to the track. He did not say only in parts of the track or anywhere else. He did not in any way attempt to distinguish it from other drop tower rides that were discussed. In addition, the adapted to extend the length limitation can also be infringed under the doctrine of equivalence, because as we've discussed, the braking force needs to be applied in certain locations throughout the length of the ride on a drop tower ride. Well, that's the same thing that's, and it needs the conductive rail to extend the length of the ride. Well, when you put a conductive rail on the bottom of a car, it, in effect, extends the length of the ride, given that it travels from the very beginning of the ride to the end of the ride. You have, if it's a three-foot section or a five-foot section, it transverses the entire ride and therefore extends the length of it. It just does so in a slightly different way, but the result is the same. A braking force is obtained when it passes through the magnets, and an eddy for a current force is created. In addition, the same applies to the configured for attachment limitation. Would you cite as a case in support of your doctrine of equivalence argument? The Fester case? No, you should cite Corning. The cladding in the dopant is reversed. They put a negative dopant in the core, according to the claims, and all they did is put the positive dopant in the cladding, just reversing where the elements occurred. And that's exactly what Magnetar has done here. There's nothing, there's no difference. You could make that argument, except they didn't have to deal with prosecution history estoppel. How do you get around that? Well, Your Honor, prosecution history estoppel, we would argue, does not apply in this instance, and that's because there's an original claim one that was submitted to the patent and trademark office. It did not discuss anything regarding a conductive rail. It had no information in there regarding the two limitations that are at issue in this case. Instead... It claimed a device. It claimed the whole roller coaster. That was a big problem. Big problem. Right. And that's what the patent and trademark office pointed out, is that you can't claim the whole ride because we have prior art that says, here's a vehicle with magnetic brakes, or then you amended down and then you still didn't get your patent. Well, when it was invented down, and just to clarify, it was an amendment of any claim. It was a new claim and it's similar to... But it's a new claim pursuant to a permanent rejection. Why isn't that just effectively an amendment? It's... Well, just to... It's falling squarely within the prosecution history of Estoppel and the factual doctrines from the Supreme Court. It is that in the Felix versus American Honda Motor Company case, this court left open the question of whether or not an original revision that doesn't include any of the claim limitations previously, any part of the disputed claim limitations, whether or not the presumption of surrender applies in that instance. In footnote 4 of that case, that involved a particular gasket limitation that appeared in dependent claim 8, but not in claims 1 and 7. Claim 8 was left in there, and therefore, I'm sorry, in claim 7, claim 8 was revised to include the limitation, and the court said, well, we're not going to decide what would happen if the patentee had simply modified claim 8, which did not have any reference to the gasket limitation. Well, that's what happens here, is that claim 1, the original claim 1, had no reference whatsoever to the conductive rail limitation. But then when you came up with your new revised, whether new or revised, you then amended it again? There was a second amendment based on the fact that in the what was then claim 24, the patentee claimed that the conductive rail was actually attached to, not configured for attachment, but attached, and the PTO said, well, you're still running the same problem, where we don't know if you're claiming the whole ride or just the braking device. And so that's when the amendment came, where we included the configured for attachment. You're in the rebuttal time. You want to say anything to that, Mr. Ward? Yes, I would like to say the rebuttal. Thank you. Mr. Segonda? Good afternoon, Your Honors, and may it please the Court. I'll start with that extended length limitation, which was the focus of the discussion, and to start with, I don't think that the claim construction issue needs to be readdressed. The Court construed the claim in the prior appeal. District Court applied that construction, and there wasn't any challenge, really, on the literal infringement issue in Intiman's briefs here. We hear that today in the oral argument, but the evidence at the District Court does not reveal anything about what the District Courts have actually made or offered to sell a drop-tower embodiment. Mr. Probonik said he could design a fin, and the District Court said that there was no evidence that a contractually binding offer, having specific terms, was ever set forth, and we don't have any actual design that Intiman could read the claim on. So as a result, the District Court properly concluded that there was no factual dispute, barring summary judgment, of no infringement. Don't you think one of skill in the art would understand that Claim 1 is broad enough to encompass the roller coaster embodiment? Well, that might have been something that a drafter- This isn't tough to figure out. This communicates pretty clearly what is claimed, doesn't it? No, Your Honor, I don't think so, particularly in light of the file history where many, many claim limitations were added. When that original claim was rejected in light of the prior art, the concept of using this eddy current break in an amusement park ride was rejected as shown by the prior art. Intiman was then forced to add quite a number of structural limitations, and they specified many more than the ones that we're litigating over here and presenting to the Court, but they're quite specific on where the various components are attached, that the magnets be attached at one place and that the fins be attached another place. And if Your Honor is asking, could it have been drafted generically, and could they have had dependent claims that might have claimed the various species, we'll never know. And it may well be, but they did not do it properly here. Intiman had a dependent claim, 10, directed to the roller coaster, and the district court found that invalid. Intiman has not challenged that on appeal. So I don't think that they could say that it reads on the roller coaster. And certainly in light of FESTO, what the argument Intiman is urging the Court to adopt would do, would create an enormous loophole in FESTO and encourage patent applicants to simply cancel claims and then resubmit new ones which were drastically narrowed and say there's no estoppel. And that's not one of the recognized exceptions under FESTO, and there is a narrowing amendment for purposes of patentability. There's no debate that that's what happened there. So what they gave up in the narrowing claim then would be gone by DOE? Correct. Does that really square with FESTO, Supreme Court's FESTO? I think presumptively, that's where we are, is that it's not narrowing unless they, as a patent owner, can come back and show some other, show either that it was not narrowing or show some other reason for the amendment. And they have not done that. They have not presented evidence on that. And certainly the file history in general also includes arguments explaining that it is because of the limitations in the narrow claim that there is a patentable invention distinguishing the prior art, that Behrman prior art reference that gave rise to the initial 102 prior art rejection. So there's estoppel by argument as well as by amendment here. And which is the strong of your two arguments though, is it by argument or by? I think by amendment, Your Honor, is simpler because of the fact that even Intimate admits that these limitations that we're focused on were not in claim one of the original application. They were not present. They were added as a result of that amendment. So that's I think the simplest approach and they haven't presented any reason for an exception to the FESTO presumption here. But the whole purpose of those amendments was just to say you can't claim the whole roller coaster. You just got to claim the break. It didn't really affect where you put the conductive element, right? That was not what the objections were about at all. I think if they had made the argument that that was tangential, we'd probably have to sustain it, wouldn't we? I think, Your Honor, that is only the second round of amendments. The second round of amendments were in response to an indefiniteness objection where the patent office said, you claim, in the preamble it says a break, but then you say in the body of the claim that it's attached, if it's just the break that you're claiming, there's some ambiguity here. Does it need to have the rest of the ride or not? And that led to that second amendment. And I think, Your Honor, that doesn't change the outcome here because MAGNITAR's non-infringement position is not based on the fact that it sells the breaks as opposed to the entire amusement park ride. We're not saying we don't infringe because we deliver the magnets and the fins and our customer, the amusement park ride, then bolts it in place and they're the infringers. We're, you know, the record's clear that MAGNITAR does the installation. We're not trying to avoid liability based on who actually does the attaching step. And that, I think, is only relevant to that second round of amendments. But what I would like to talk about is the unclean hands judgment as well. We think that the district court did not abuse its discretion in finding unclean hands based on what really is an undisputed factual record here regarding what happened with this assignment that was recorded both in 2005 and 2007. There's no dispute that that assignment was falsified. The dates are off by years. No one at Intamin has disputed that or even claimed that they were unaware of the fact that the document had been backdated. They, it's public record that it was recorded on multiple occasions, even with Intamin's president going so far as to fill out the cover sheet that the Patent Office Assignment Branch asks for under Section 3 of 37 CFR and filled in the date of execution with the falsified dates of 1997, which we know were false because the patent issue date and patent number are referenced in the body of the assignment. And those events occurred years later and could not have been known in 97. There's no dispute that that document wasn't produced in discovery. We were conducting discovery regarding the assignment issue. We were litigating over whether the inventors were relevant witnesses and should be produced for deposition. And at the very same time, apparently they were aware of this falsified assignment, which was then asserted against third party licensees to encourage them to continue to pay royalties. So that whole factual background is not in dispute that those events occurred. And so the district court, we think, was well within its discretion to define that those events occurred. Those were inequitable falsification of a patent assignment and recording it with an assignment branch certainly is an inequitable thing to do. And that those were related to the action that was brought against Magnetar, not only historically in terms of the genesis of the case being an enforcement action, the patent was asserted against multiple competitors. Magnetar happened to be one who chose not to take a license as a result we got sued, but also because establishing the chain of title and the ownership is a fundamental part of the patent owner's burden here. And Intamin, of course, came to court pleading that it was the owner and relying on now essentially choosing to rely on a selective... What's Intamin's relationship to the inventors and Intamin's relationship to Funix?  I believe own Intamin Limited, the U.S. company. The inventors are part of their... members of the family that are principal shareholders of the company in New York. So they thought they owned the whole thing the whole time? Well, the exact ownership... Doesn't that kind of justify their unclean hands a bit? Well, Your Honor, I think that certainly... You're cleaning up the record, but in fact it doesn't change the ownership at all. They all owned it off the whole time anyway. Well, the difficulty with that is twofold, Your Honor, one being even if they might have considered themselves part of a closely held group, I don't think that justifies falsifying a document and recording it with the patent office. But secondly, we have this intervening series of assignments. We have the falsified assignment, which supposedly took place in 97, but now the chain of title starts to really veer off when we assign to Funix. I don't know the relationship of Funix. They are not a litigant, and Funix then assigns back to a subset of the inventors who in turn assigned to Intamin. And what's happened here is both the falsified assignment make, and their explanation for it, that this was essentially an oral handshake deal that they had had all along, both of those now make it very difficult to explain how the remaining recorded assignments can have any logical chain here. And Magnitar here is now in a position of trying to unravel by virtue of this falsification and this series of recorded assignments just exactly what happened and what of the public record really can be relied on. That's a rather messy issue. Was it necessary for the trial court to go there in order to get the result the trial court wanted to read? Well, certainly the judgment in favor of Magnitar based on non-infringement can stand. That would end the case as far as the patent infringement liability is concerned. What I do think, however, this court's guidance on that issue could be helpful to be sure that we don't have a third appeal here. I mean, we think that the issue of exceptional case and any attorney fee awards has been dealt with by the district court. We think any challenge to that by Intimate has been waived. But to really be sure that this is the last time we appear in front of your honors, I think given the district court some guidance on that unclean handshake issue. Like an advisory opinion on the ownership issue? No, not on ownership, actually. I don't think the court needs to resolve ownership, and the court needs to resolve ownership. I'm not suggesting that, but the question of whether this is unclean hands or not, I think, while again, need not be addressed to a firm, certainly could give us better assurance in the long run. But it is an issue for us, though, right? Correct. Correct. It is one of the BCs of the nation. And the issue is essentially premised upon falsification of documents before a government agency. Correct. And that's not in dispute. It's called perjury. That's a good term for it, your honor. And I think in light of the fact that it was not only made part of the government record, but then relied on by Intimate to assert against other parties, I think builds the significance of it, particularly, again, as I said, since we not only have a patent that is infused with the public interest, which is under the Ninth Circuit unclean hands cases, the public interest is a direct threat in terms of the unclean hands analysis, but also, as I said, we've been litigating over these issues. The documents were concealed during discovery from Magnetar while we were dealing with this, and that's a further basis for the district court's conclusion that there was misconduct, which supports the unclean hands. Did you ask for Rule 11 sanctions? We did in the prior appeal, your honor, but on this one, you know, we did not. The Ninth Circuit standard on what supports that is quite complex, but we did ask, and subsequently, we did get an exceptional case order from the district court and an attorney field work based on that. If there aren't any other questions. Thank you, Mr. Conville. Thank you. Mr. Ward, you have a little over a minute left. Thank you, your honor. Turning quickly to the unclean hands argument, there is actually evidence of the ownership and the intent behind what Intamin was doing, and that evidence is undisputed because Intamin described that it received the right title of interest to prosecute that patent here in the United States. It paid for all the fees. It pays for all the maintenance fees. It pays the attorneys who prosecuted it. It, by agreement with the inventors from prior to its filing, Intamin was to have those rights and was supposed to enforce them here in the United States because the inventors and Funix are European companies unrelated corporately to Intamin, and they do not do business here. So is there a need to essentially falsify documents? Well, your honor, I would contest that they are falsified. I would say they are inartful in that the inventors didn't date it on the date they signed it, but the intent of Intamin was to clarify the records for the entire public that it received the rights at the time that it started filing the patent, and it was the one responsible for all the rights and protecting those rights here in the United States. So yes, the dates should have been different, but the inventors intended to give Intamin all of those rights, titles, and interests. But there was a finding by the district court that it was a falsification. Well, also because the district court ignored, for credibility reasons, Mr. Kernack's declaration, which is the only declaration describing the events surrounding the ownership, the filing, and the prosecution of the patent, and the attempts to obtain licenses afterwards. And under Anderson Liberty and all the other cases that describe the principles for summary judgment, the judge cannot ignore the declaration of Mr. Kernack just because they found a credibility issue. Thank you, Mr. Wolf. Thank you, Mr. Ward. We'll go on.